UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| LEWIS P. McCLUNG, JR. | CIVIL ACTION NO. 11-0263 |
|---|---|
| VERSUS | MAGISTRATE JUDGE HILL |
| SHELL CHEMICAL, LP, ET AL | BY CONSENT OF THE PARTIES |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Pending before the undersigned is the Motion for Summary Judgment filed by defendant, Shell Chemical, LP ("Shell"), on July 20, 2012. [rec. doc. 31].[1] Plaintiff, Lewis P. McClung, Jr. ("McClung"), has filed opposition. [rec. doc. 41]. Shell filed a reply brief. [rec. doc. 43]. The matter was submitted on briefs.

For the following reasons, the motion is **GRANTED**.

### Background

McClung brought this employment discrimination action against his former employer, Shell, and three Shell employees, Randy Gautreaux, Ken Yurik, and Craig Inman, claiming that he was unlawfully terminated against on the basis of his race, sex, and age. He filed suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the Age Discrimination in Employment Act of 1969 ("ADEA"), 29 U.S.C. § 621, and the Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:301 *et seq.* Additionally, he asserts claims for Shell's alleged nonpayment of wages under the

---

[1] All claims against the other defendants, Randy Gautreaux, Ken Yurik, and Craig Inman, were previously dismissed by the Court. [rec. doc. 21].

Louisiana Private Works Act, La. Rev. Stat. §§ 9:4802(G)(2) and (3), and Public Works Act, La. Rev. Stat. § 38:442.

McClung was employed by Shell at its plant in Geismar, Louisiana in 1976. During his employment, he worked as a process operator, driver, dock loader, in distribution, in maintenance, and in logistics. In 2004, Shell decided to contract out its logistics work, and McClung was given the opportunity to move either to the Utilities Department or the Quality Assurance ("QA") Department. He chose to go to QA, which involves work in the plant's laboratories.

McClung's supervisor in the QA Department from 2006 to early 2009, was Ken Yurik ("Yurik"). When Yurik retired in 2009, Craig Inman ("Inman") became McClung's supervisor. At all times relevant to this lawsuit, Yurik reported to the QA Department Manager, Randy Gautreaux ("Gautreaux").

Each year, McClung's supervisors in the QA department met with McClung, gave him a written performance evaluation, and discussed it with him. On June 28, 2007, Yurik gave McClung a performance evaluation in which he noted as follows:

> Multi-tasking, prioritizing work, time management and work pace are opportunity areas for Paul. People skills are important considering the number of plant customers QA has.
> Paul needs to demonstrate thorough knowledge of his job. (Not needing so much help from others)
> Paul's performance is not at a level where he could serve on a department or plant team.
> Paul was disappointed with this performance review. He did agree to do "whatever it takes" to improve. ... We agreed that we will be discussing an improvement plan.

2

[rec. doc. 31, Exhibit 2, pp. 6-7]. In August of 2007, Yurik changed McClung's schedule to a day shift in order to give McClung more time to do training.

On October 23, 2008, Yurik gave McClung another performance evaluation, in which he rated McClung as "moderately effective" in two categories and "not effective" in two categories. Yurik's comments included the following:

> Some of the items in this category [Business Orientation and Results] Paul continues to struggle with. Work pace and multi tasking are a real challenge/opportunity for him. He cannot consistently get his results out in a timely manner. He cannot consistently work independently. If something goes wrong with a test, his first response is to seek assistance rather than troubleshoot the problem himself. He gets aggravated very easily which has an adverse effect on the other analysts. He often leaves work undone so that the other analysts have to complete what's left, or he has to try to complete it the next day which puts him further behind.

[rec. doc. 31, Exhibit 5, p. 4].

Because McClung's performance had not progressed satisfactorily, Yurik put McClung on a Performance Improvement Plan ("PIP"), and discussed the PIP with McClung. [rec. doc. 31, Exhibit 6]. The PIP listed five performance expectations and provided that:

> Failure to meet all of the performance expectations set forth in this plan could lead to termination of your employment with Shell.

[rec. doc. 31, Exhibit 6, p. 2].

Shortly after McClung signed the 2008 PIP, he went on vacation. When he returned, Yurik had retired. In the spring of 2009, Inman, with whom McClung had worked in the lab, replaced Yurik as the QA Department's supervisor.

On June 2, 2009, Inman met with McClung, gave him a revised PIP, and discussed the updated performance expectations with him. The revised PIP provided as follows:

> [S]ustained improvement must be demonstrated beyond July 31, 2009, or your continued employment with the Company will be in jeopardy.

[rec. doc. 31, Exhibit 7, p. 4]. McClung signed the revised PIP on June 2, 2009.

After McClurg signed the revised PIP, Inman met with McClung periodically to discuss McClung's performance. McClung completed the PIP satisfactorily, and met with Inman on July 30, 2009, to discuss his performance expectations. At the conclusion of the meeting, McClung signed a document in which Inman advised as follows:

> As stated in our meeting today, you are expected to sustain this improved level of performance in the future and I will continue to monitor your performance. If your level of performance is not sustained, an additional PIP will not be an option and your continued employment with the Company will be in jeopardy.

[rec. doc. 31, Exhibit 8].

On October 19, 2009, McClung had a confrontation with his co-worker, Felicia Graves ("Graves"), because he thought she was giving credit for running extra samples, for which Shell gave perks, to another employee instead of him. He had another incident with Graves on November 25, 2009, in which he admitted that he raised his voice. After the second incident, Graves called Inman, who was on vacation, at his home. Inman came to the plant and discussed the incident with McClung, Graves, and other employees who were present at the time. Following the meeting, Inman directed McClung to apologize to Graves.

4

Subsequently, Inman and Gautreaux conducted an investigation of the second incident. After the investigation, Inman sat down with McClung and told him that this type of incident could not happen anymore.

Following the altercation with Graves, McClung had another incident in which he became upset when two female employees, Lori Girouard ("Girouard") and Angie Pruett ("Pruett"), received special recognition for running samples during a freeze when McClurg believed that they did not deserve any credit. He commented to them that they "could put the samples on the counter or where the sun don't shine." [rec. doc. 31, Exhibit A, p. 64]. McClung called Inman, who instructed McClung to apologize to the women.

The following day, McClung met with Pruett, who said something that made him angry. Afterwards, he pulled her access card out of the computer and threw it on the table. He then called Inman and asked for a couple of days off. After McClung had been at home for three days, Gautreaux called him and told him that the latest incident was under investigation.

Eventually, Gautreaux called McClung back to the plant for a meeting with Gautreaux, Inman, and Shell's Employee Relations Advisor, Andrea Pechal ("Pechal"). At that time, they informed McClung that he was going to be terminated that day because of a decline in his work performance and his communication skills. They gave MClung

5

the option of retirement in lieu of termination. McClung chose to retire, and handwrote a letter that day, March 26, 2010, stating as follows:

> I Lewis P. McClung Jr. I have elected to retire in lieu of termination effective April 1, 2010.

[rec. doc. 31, Exhibit 10].

McClung handed the letter to management on March 26, 2010, which was his last day at the plant.

On March 31, 2011, McClung filed suit against defendants in the Twenty-Third Judicial District Court for the Parish of Ascension, State of Louisiana. Defendants removed the action to this Court on April 21, 2011.

On July 20, 2012, Shell filed the instant Motion for Summary Judgment [rec. doc. 31] seeking dismissal on the grounds that: (1) McClung's federal discrimination and retaliation claims are untimely; (2) McClung's state law discrimination and retaliation claims are also untimely; (3) alternatively, McClung's claims discrimination and retaliation claims lack merit, and (4) the Louisiana Public and Private Works Acts are inapplicable to McClung's claims.[2]

---

[2] McClung does not oppose dismissal of his claims under the Louisiana Public and Private Works Acts. [rec. doc. 43, p. 1]. Accordingly, those claims are hereby DISMISSED.

## Law and Analysis

### *Standard for Motion for Summary Judgment*

Fed. R. Civ. Proc. 56(a) provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The standard for granting summary judgment remains unchanged after the 2010 amendments. Advisory Committee Notes to Subdivision (a).

### *Prescription*

McClung brought his claims against Shell pursuant to Title VII, the ADEA, and Louisiana's Employment Discrimination Law, LA. REV. STAT. 23:301 *et seq*. ("LEDL").

Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue. *Id.* (*citing Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir.1996)). The EEOC charge must be filed within 300 days from the date the unlawful employment practice occurred. *Harris v. State Farm Fire & Cas.Co.*, 178 F.Supp.2d 680, 689 (W.D. La. 2001) (*citing* 42 U.S.C. §2000e–5(e)(1); 29 U.S.C. § 626(d)). Thus, any claims arising more than 300 days prior to the filing of the EEOC charge are time-barred. This requirement to file a lawsuit

within the limitation period is strictly construed. *Duron v. Albertson's LLC*, 560 F.3d 288, 289 (5th Cir. 2009).

The Supreme Court has provided guidance in determining the sufficiency of notice required to start the limitations period in a Title VII or ADEA case. *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011) (*citing Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). In the context of a non-tenured professor's teaching contract, *Ricks* held that the filing limitations periods commenced at the time the tenure decision was made and communicated to the plaintiff, even though one of the effects of the denial of tenure – the eventual loss of a teaching position – did not occur until later. *Id*. at 258. Thus, the proper focus is at "the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Phillips*, 658 F.3d at 456 (*citing Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed. 2d 6 (1981)).

Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes. *Smith v. Amedisys Inc.*, 298 F.3d 434, 448 (5th Cir. 2002) (*citing Nichols v. Lewis Grocer*, 138 F.3d 563, 566 (5th Cir.1998)). Under Louisiana law, a cause of action based on discrimination is a delictual action subject to a one year prescriptive period which commences the day the injury or damage is sustained. *Eastin v. Entergy Corp.*, 2003-1030 (La. 2/6/04); 865 So.2d 49, 53; La. Civ. Code Ann. art. 3492.

Louisiana applies the two seminal United States Supreme Court cases, *Chardon* and *Ricks,* to hold that the damage is sustained in any employment discrimination case at the earlier of the date the employee is informed of his termination or his actual separation from employment. *Id*.

Here, McClung met with with Gautreaux, Inman, and Pechal on March 26, 2010. At that time, they informed McClung that he was going to be terminated because of a decline in his work performance and his communication skills. They gave him the option of retirement instead of termination. That same day, McClung chose to retire, and confirmed his intentions in a handwritten letter. McClung handed the letter to management on March 26, 2010, which was his last day at the plant.

Under *Ricks*, the time period for McClung to file an EEOC charge commenced on March 26, 2010, which was the day in which he was notified that he was being terminated. McClung was required to file an EEOC charge by January 20, 2011, which was the 300th day after he was notified of his termination. However, he did not file his EEOC claim until March 16, 2011, which was almost two months later. The EEOC confirmed that McClung's claim was time-barred in its Dismissal and Notice of Rights. [rec. doc. 31, Exhibit 14].

In response to Shell's argument, McClung asserts that the doctrine of *contra non valentum* should suspend prescription on his claims. The doctrine of *contra non valentem* provides that prescription does not run against one who is ignorant of the facts upon

which their cause of action is based and applies an exception to the statutory prescriptive period where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues. *Eastin, supra, at* 55.

The Louisiana Supreme Court recognizes four limited situations where the doctrine applies to prevent the running of prescription. *Id*. The only argument raised by McClung in this area relate to the fourth element, known as the "discovery rule," and provides that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. *Id*. (*citing Griffin v.Kinberger*, 507 So.2d 821 (La.1987)). This standard is exceedingly stringent and should be applied only in exceptional circumstances. *Id*.

Here, McClung asserts that this Court should apply the doctrine of *contra non valentum* to the limitations period applicable to his discrimination claims because he was not aware that he had a viable cause of action against the defendant until he contacted the EEOC. [rec. doc. 41, p. 2]. A similar argument was raised in *Eastin,* where 11 plaintiffs filed an age discrimination suit under Louisiana law. Defendants argued that plaintiffs' claims had prescribed as they had been terminated more than one year before suit was filed. In response, plaintiffs asserted that the doctrine of *contra non valentem* applied to suspend prescription because they were not aware of an alleged pattern of discrimination and, therefore, had no way of knowing that they had a cause of action within one year of their terminations. The court found that plaintiff's request was "simply untenable",

10

reasoning as follows:

> Plaintiffs may not simply sit on their hands and do nothing to investigate their termination and expect their actions to be deemed reasonable. Under the facts of the instant case, where the plaintiffs alleged absolutely no active role in determining if their terminations were for unlawful reasons and made no inquiry into the reasons for their terminations, the plaintiff's delay in filing suit was not reasonable and does not merit the application of the doctrine of *contra non valentem*. . . . Moreover, plaintiffs have alleged no facts which lead this court to believe that they were somehow prevented from filing their suits in a timely manner. Their delay can only be attributed to their own inaction.

*Id*. at 56.

Here, McClung admits in his opposition brief that "he was painfully aware that he was not being treated fairly." [rec. doc. 41, p. 3]. Despite this, he took no action to determine if any legal remedies were available to him. The facts in this case show that prior to his termination, McClung had several confrontations with co-workers and thought that they were unfairly given undue credit. He certainly was not "ignorant of the facts" upon which his cause of action was based. *Eastin* at 55. As in *Eastin*, his delay in filing suit was simply unreasonable, and does not merit the application of the doctrine of *contra non valentem*.

Because McClung filed his EEOC charge more than 300 days after the day in which he was notified that he was being terminated, and no exception applies, his claims have prescribed under federal law. Additionally, because his suit was filed more than one year from the date the injury or damage (*i.e.*, termination) was sustained, his claims have prescribed under state law.

## Conclusion

Accordingly, **IT IS ORDERED** that the motion for summary judgment be **GRANTED**, and that all claims against defendant, Shell Chemical, LP, be **DISMISSED WITH PREJUDICE**.

Signed September 25, 2012, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent: D. Bonaventure
On: 9-26-2012
By: MBD